# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRIE L. MARRICAL,<br><br>    Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>    Defendant. | Case No. EDCV 16-00398-RAO<br><br>**MEMORANDUM OPINION AND ORDER** |

## I.  INTRODUCTION

Plaintiff Terrie L. Marrical ("Plaintiff") challenges the Commissioner's denial of her application for a period of disability and disability insurance benefits ("DIB"). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.  PROCEEDINGS BELOW

On December 30, 2010, Plaintiff filed a Title II application for DIB alleging disability beginning November 15, 2008, through March 31, 2010, the date last insured. (Administrative Record ("AR") 323-24). Her application was denied initially on March 17, 2011, and upon reconsideration on June 3, 2011. (AR 165-

76.) On July 6, 2011, Plaintiff filed a written request for hearing, and a hearing was held on July 13, 2012. (AR 177-79, 253.) Represented by counsel, Plaintiff appeared and testified, along with an impartial vocational expert. (AR 59-90.) On July 25, 2012, the Administrative Law Judge ("ALJ") found that Plaintiff had not been under a disability, pursuant to the Social Security Act,[1] since November 15, 2008. (AR 151.) On August 23, 2012, Plaintiff sought review, and the Appeals Council granted her request. (AR 275-78.) Another hearing was held on April 28, 2014, where an impartial vocational expert testified in light of additional medical records. (AR 91-114.) On August 1, 2014, the ALJ again found that Plaintiff had not been under a disability, pursuant to the Social Security Act, since November 15, 2008. (AR 13-28.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. (AR 1-4.) Plaintiff filed this action on March 3, 2016. (Dkt. No. 1.)

The ALJ followed a five-step sequential evaluation process to assess whether Plaintiff was disabled under the Social Security Act. *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995). At **step one**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 15, 2008, the alleged onset date ("AOD"), through March 31, 2010, her date last insured[2]. (AR 18.) At **step two**, the ALJ found that through the date last insured, Plaintiff has the following severe impairments: degenerative joint disease and degenerative disc disease of the lumbar spine; pancreatitis; hypertension; depression; cervical strain; and obesity. (*Id*.) At **step three**, the ALJ found that Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the

---

[1] Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment expected to result in death, or which has lasted or is expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A).

[2] As discussed below, the relevant time period that the ALJ evaluated was a period that ended in 2010, prior to the administrative hearings and the ALJ's decision in this matter.

2

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (AR 19.)

Before proceeding to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform a range of sedentary work . . . . Specifically, the claimant can lift 10 pounds occasionally; can stand and/or walk for two hours out of an eight-hour workday; can perform postural activities occasionally; cannot perform repetitive or constant handling or fingering, but frequent is still permissible; is restricted to unskilled work; and is precluded from fast paced work production or assembly line type work.

(AR 20.)

At **step four**, based on the Plaintiff's RFC and the VE's testimony, the ALJ found that Plaintiff was not capable of performing past relevant work as a retail merchandiser, cashier/checker, retail supervisor, or sales clerk. (AR 26.) At **step five**, the ALJ found, "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed." (AR 27.) Accordingly, the ALJ found that Plaintiff had not been under a disability from the AOD through the date last insured. (AR 28.)

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. A court must affirm an ALJ's findings of fact if they are supported by substantial evidence, and if the proper legal standards were applied. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). An ALJ can satisfy the substantial evidence requirement "by setting out a detailed and thorough summary of the facts

and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).

"[T]he Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion." *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001) (citations and internal quotation marks omitted). "'Where evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1198 (9th Cir. 2008) (citing *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)); *see Robbins,* 466 F.3d at 882 ("If the evidence can support either affirming or reversing the ALJ's conclusion, we may not substitute our judgment for that of the ALJ."). The Court may review only "the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citing *Connett v. Barnhart,* 340 F.3d 871, 874 (9th Cir. 2003)).

## IV. **DISCUSSION**

Plaintiff raises two issues for review: (1) whether the ALJ properly considered Plaintiff's testimony; and (2) whether the ALJ properly characterized Plaintiff's inability to manipulate repetitively. (Joint Stipulation ("JS") at 5, Dkt. No. 28.) Plaintiff contends that the ALJ improperly discredited Plaintiff's testimony (JS at 5-9) and inaccurately characterized Plaintiff's handling and fingering ability (JS at 22-24). The Commissioner contends that the ALJ properly evaluated Plaintiff's credibility (JS at 9-18) and that substantial evidence supports the RFC and step five findings (JS at 24-28). For the reasons below, the Court agrees with the Commissioner.

///

///

4

## A. The ALJ's Credibility Determination Is Supported By Substantial Evidence

Plaintiff argues that the ALJ's finding that her subjective complaints are not fully credible is unsupported by clear and convincing evidence. (*See* JS at 5-9.) The Commissioner argues that the ALJ's reasons for finding Plaintiff not fully credible are supported by substantial evidence. (*See* JS at 9-18.)

### 1. Plaintiff's Testimony

At the July 13, 2012 administrative hearing, Plaintiff testified that she was born on December 6, 1961, and graduated from high school. (AR 66.) She last worked in November 2008, doing part time customer service work at a bowling alley. (AR 66-67.) Plaintiff also testified that after she left the bowling alley, she tried to go back to work as a cashier in a store for about a month, but "it just didn't work" due to the pain in her side. (AR 67-68.) After that, she looked for other work, but "didn't get anything." (AR 68.)

Plaintiff testified that she lives with her partner and two of her three adult children. (AR 72.) Her partner's job is the sole source of household income. (AR 72.) She testified that her children helped "a lot" with housework. (AR 79.)

Plaintiff testified that she was hospitalized for three days in January 2008 when her pancreatitis developed. (AR 78, 80.) She was unable to work prior to March 2010 because about once a week, she would get an "off and on" pain in her right side that would "double [her] over" and make it hard to do anything. (AR 74, 81.) The pain would last for about an hour, and Plaintiff would need to lie down. (AR 74, 81.) On a bad day, she would stay in bed because she feared that the pain would start again if she got up. (AR 81-82.) Plaintiff testified that she is not able to engage in any activity during a pancreatitis flare-up. (AR 83.) Her pain is "about a ten" without medication, but "probably may even go down" after her medication begins working. (AR 83.)

///

Plaintiff testified that she also has "constant, constant" back pain that makes it hard for her to lift things and stand. (AR 74.) Before March 2010, her pain was an eight on a ten-point scale. (AR 74.) Plaintiff began taking Vicodin, but "that wasn't really working," so she switched to Norco. (AR 74.) Medication would "take the edge off" and bring the pain down to a six. (AR 74.) Plaintiff would have muscle spasms in her lower back three or four times a week, "maybe a couple times a day," for 10 to 15 minutes at a time. (AR 82-83.) During a spasm, Plaintiff cannot engage in any activity or focus on anything else. (AR 83.) Plaintiff also testified that "once in a while" she has neck pain when she turns her neck. (AR 82.)

Plaintiff testified that since she stopped working in November 2008, she has done "[n]othing." (AR 75.) She talks to her children when they are home, but otherwise "really do[es]n't do too much" besides sitting or lying down. (AR 76.) Plaintiff sometimes feels depressed because there is "just a lot going on." (AR 75-76.) Her depression began bothering her "off and on" beginning in 2008. (AR 76, 84.) Before March 2010, Plaintiff kept to herself, "wouldn't do anything," wouldn't leave her room, and wouldn't take care of her hygiene. (AR 85.) A depressive episode would last for "[a] couple days" every week. (AR 85-86.) Her primary care doctor prescribed Lexapro, but "[i]t didn't really help much." (AR 76.) Plaintiff did not see a therapist or psychologist. (AR 76.)

Plaintiff testified that before March 2010, she could lift and carry ten pounds. (AR 77.) She could not walk or stand for very long because her back "had started really bothering [her]." (AR 77.) She could stand for about 30 to 45 minutes and could sit for "a couple hours" before needing to lie down. (AR 79.) Plaintiff would lie down for two hours about three or four times a day. (AR 79.) She testified that an x-ray revealed degenerative disease, which began to "get worse." (AR 78.) Plaintiff testified that her doctor told her to "take it easy" and "[d]on't lift a lot." (AR 79.)

///

Plaintiff testified that she would sometimes drop things. (AR 74.) She has difficulty with both small and large objects. (AR 84.) She can keyboard "[o]nce in awhile," but she doesn't use a computer very much. (AR 84.) Plaintiff can pick up objects like utensils, but when her hands bother her, she drops the objects due to numbness in her fingers. (AR 84.) No doctor has suggested an explanation; Plaintiff testified that it is "[p]robably just from [her] back." (AR 84.)

Plaintiff completed a function report on February 4, 2011. (AR 390-97.) Plaintiff's son also completed a third party function report on February 4, 2011. (AR 398-405.) His report repeated Plaintiff's responses. Both reports were completed after the date last insured, and the responses addressed Plaintiff's current, not past, functioning.

Plaintiff completed an exertion questionnaire on April 30, 2011. (AR 435-37.) She again reported her current conditions and abilities, after the date last insured.

### 2. Applicable Legal Standards

"In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting *Lingenfelter*, 504 F.3d at 1036) (internal quotation marks omitted). If so, and if the ALJ does not find evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony regarding the severity of his symptoms. *Id.* The ALJ must identify what testimony was found not credible and explain what evidence undermines that testimony. *Holohan v.*

///

*Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). "General findings are insufficient." *Lester*, 81 F.3d at 834.

### 3. Discussion

"After careful consideration of the evidence," the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent those statements are inconsistent with the residual functional capacity assessment herein." (AR 21.) The ALJ declared her testimony to be "only partially credible." (*Id.*) The ALJ relied on the following reasons: (1) inconsistent statements; (2) routine and conservative treatment; and (3) lack of supporting objective evidence. (AR 22.) No malingering allegation was made, and therefore, the ALJ's reasons must be clear and convincing.

#### a. Reason No. 1: Inconsistent Statements

The ALJ found that Plaintiff made inconsistent statements about her ability to work during the alleged disability period. (AR 22.) Specifically, the ALJ noted that, despite Plaintiff's testimony that she could not work due to her impairments, Plaintiff "admitted that she had looked for other work, but had been unsuccessful in finding anything." (AR 22, 68.) The ALJ also noted that Plaintiff had once told her physician that she applied to work as a truck driver. (AR 22, 645.)

As part of the credibility determination, the ALJ may consider inconsistencies between the claimant's testimony and her other statements, conduct, and daily activities. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). Here, Plaintiff's statements that she was looking for work while allegedly disabled undermines the credibility of her pain testimony. *See Fregoso v. Astrue*, 2012 WL 2195655, at *4 (C.D. Cal. June 14, 2012) ("[P]laintiff's testimony at the hearing that she had been looking for work was inconsistent with plaintiff's assertions that she suffers from

disabling impairments which preclude her from working at all."), *aff'd* (9th Cir. Aug. 13, 2013).

The Court finds that this reason is a clear and convincing reason, supported by substantial evidence, to discount Plaintiff's credibility.

### b. Reason No. 2: Routine and Conservative Treatment

The ALJ also discounted Plaintiff's credibility because "[t]he treatment records reveal the claimant received routine, conservative, and non-emergency treatment since the alleged onset date through the date last insured" for her pancreatitis, back pain, and depression. (AR 22.) An ALJ may discount a claimant's credibility based on routine and conservative treatment. *See Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (rejecting plaintiff's complaint "that she experienced pain approaching the highest level imaginable" as "inconsistent with the 'minimal, conservative treatment' that she received").

The ALJ noted several instances where Plaintiff sought medical treatment for abdominal or right flank pain, but the ALJ concluded that Plaintiff received "conservative treatment" each time. (AR 22-23.) ALJ's conclusory determination that Plaintiff received "conservative treatment" is an improper basis for discounting Plaintiff's credibility. Plaintiff has been prescribed narcotic pain medication for her abdominal pain since at least January 2008. (AR 553, 675.) *See Childress v. Colvin*, 2014 WL 4629593, at *12 (N.D. Cal. Sept. 16, 2014) ("It is not obvious whether the consistent use of such a narcotic (for several years) is 'conservative' or in conflict with Plaintiff's pain testimony, and therefore requires further explanation."). Moreover, Plaintiff asserts that chronic pancreatitis, the cause of her abdominal pain (*see* AR 74, 78, 553), has no cure. (JS at 6.) "A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist." *Lapeirre–Gutt v. Astrue,* 382 F. App'x 662, 664 (9th Cir. 2010);

9

*see also Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) ("[C]onservative course of treatment . . . is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment.").

The ALJ also stated that Plaintiff received "routine conservative treatment" for her back pain and depression, but the ALJ failed to explain how the treatment was conservative. (AR 22.) Indeed, the ALJ failed to mention *any* treatment for back pain during the relevant disability period.[3] The ALJ noted that Plaintiff's primary care physician prescribed medication for her depression, and the record did not contain objective psychological findings or records of any treatment by a mental health specialist. (AR 23.)

The ALJ stated that "[t]he lack of more aggressive treatment, surgical intervention, or even referral to a specialist" suggested that Plaintiff's symptoms were not as severe as alleged. (AR 22.) However, there is no evidence in the record that more frequent or aggressive treatment was available to treat Plaintiff's conditions, and the ALJ was not qualified to draw her own inference regarding whether such treatment was available. *See Tran v. Colvin*, 2016 WL 917891, at *6-7 (C.D. Cal. Mar. 8, 2016) (finding no support for ALJ's finding that surgery or more aggressive treatments were available options to treat claimant's conditions, and stating that an ALJ is not qualified to draw inferences regarding whether more aggressive treatment is available to treat a claimant's conditions) (citing *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) ("A claimant cannot be discredited for failing to pursue non-conservative treatment options were none

---

[3] The ALJ noted a treatment record dated November 16, 2008 that discussed Plaintiff's diagnosis of degenerative joint disease and degenerative disc disease. (AR 22.) The Court, however, believes that the handwritten date is read as November 10, 2008—before Plaintiff's AOD. (AR 620). Regardless whether this record falls within the disability period, the ALJ did not discuss any treatment, conservative or not, arising from it.

10

exist.") (citations omitted); *Boitnott v. Colvin*, 2016 WL 362348, at *4 (S.D. Cal. Jan. 29, 2016) (an ALJ is not qualified to draw his own inference regarding whether more aggressive courses of treatments were available)).

The Court finds that this is not a clear and convincing reason, supported by substantial evidence, for discounting Plaintiff's credibility.

### c. Reason No. 3: Lack of Supporting Objective Evidence

Finally, the ALJ discounted Plaintiff's credibility because her "allegations are greater than expected in light of the objective evidence of record." (AR 22.)

As the ALJ noted, the evidence in the record for the relevant time period—November 15, 2008 to March 31, 2010—regarding Plaintiff's back problems was limited. (AR 22-23.) An x-ray on September 30, 2009 revealed narrowing of Plaintiff's lumbar spine, but the ALJ noted that it was "otherwise unremarkable." (AR 23, 651.) Plaintiff had "mild" range of motion limitations at a November 3, 2009 examination. (AR 23, 685.) Plaintiff testified at the hearing that she would drop things and had difficulty using her hands due to numbness in her fingers. (AR 74, 84.) She speculated that the problem was "[p]robably just from [her] back" and admitted that a doctor never suggested a cause. (AR 84.) The ALJ noted that the record is devoid of any evidence that Plaintiff reported this issue to her doctor. (AR 22.)

The ALJ noted that the evidence in the record regarding Plaintiff's pancreatitis and abdominal pain indicated a pattern of treatment with pain medication. (AR 22-23.) On January 26, 2009, Plaintiff sought treatment for pain on her right side and received pain medication. (AR 22, 616.) She continued to receive pain medication for similar complaints. (AR 22, 467-73.) The ALJ noted that a May 11, 2009 ultrasound showed mild fatty infiltration of the liver, "but was otherwise unremarkable." (AR 23, 483.) The exam report also stated that Plaintiff's "pancreas appears unremarkable." (AR 483.) Plaintiff reported abdominal pain, nausea, and loose stools on August 4, 2009, and again received

pain medication. (AR 22, 636.) A September 2009 computerized tomography (CT) study showed a wider than usual appendix, prominent walls in the mid and lower descending colon and rectosigmoid. (AR 23, 634-35.) Although the ALJ stated that the study contained "no reference to the pancreas" (AR 23), the exam report did note that "[t]he pancreas demonstrates no enlargement" and that "[t]here are several scattered, predominantly linear calcifications in the pancreas compatible with the given clinical diagnosis of chronic pancreatitis." (AR 634.) On November 2, 2009, Plaintiff complained of pain in her lower left quadrant and occasional diarrhea and constipation; treatment records characterized the pain as "on-off." (AR 23, 645.) The ALJ also noted that Plaintiff's right side pain on March 10, 2010 was treated conservatively. (AR 23.)

Regarding Plaintiff's depression and mental impairments, the ALJ noted that Plaintiff received psychotropic medications from her general practitioner physicians. (AR 23, 647, 667.) The ALJ observed that the record did not contain objective psychological findings or treatments records from a mental health specialist. (AR 23.)

Saif Bajwa, M.D., submitted several medical source opinions related to his treatment of Plaintiff from December 21, 2007 to August 5, 2013. (AR 23, 583-88, 652-57, 733-36.) The ALJ noted that although Dr. Bajwa has treated Plaintiff since 2007, that does not mean that she has been disabled since 2007. (AR 23.) In his January 2011 assessment, Dr. Bajwa indicated that Plaintiff could sit, stand, and walk for no more than two hours in an eight-hour workday; lift and carry no more than 10 pounds occasionally; and never stoop, bend, or crouch. (AR 23, 583.) The ALJ noted that the cited positive straight leg raise test was not documented until after the date last insured. (AR 23, 589.) Dr. Bajwa's March 2011 assessment again referenced the positive straight leg raise test that was conducted outside the relevant time period. (AR 23-34, 584-88.) In his August 2011 report, Dr. Bajwa

///

specifically stated that the earliest date of Plaintiff's symptoms and limitations was July 28, 2011. (AR 24, 657.)

The ALJ stated that she did not reduce the weight of Dr. Bajwa's opinions simply because they were submitted on checklist-style forms. (AR 24.) The ALJ rejected Plaintiff's argument that Dr. Bajwa misunderstood the question about the date that Plaintiff's limitations began. (*Id.*)

In her representative brief submitted before the remand hearing, Plaintiff also argued that the record should be further developed and that Dr. Bajwa should be recontacted for clarification about the dates listed on his earlier forms. (AR 24, 465.) On March 28, 2014, Dr. Bajwa wrote a letter that indicated that Plaintiff had suffered from chronic back pain since he began treating her in December 2007. (AR 732.) The ALJ noted that Dr. Bajwa did not, however, indicate any functional limitations. (AR 24.) At the April 28, 2014 hearing, the ALJ instructed Plaintiff to obtain a clarifying medical opinion from Dr. Bajwa regarding Plaintiff's limitations before the date last insured. (*Id.*) Dr. Bajwa completed a medical source statement on May 12, 2014. (AR 733-36.) The ALJ noted that this assessment again concerned Plaintiff's limitations beyond the relevant time period of November 2008 to March 31, 2010. (AR 24.) In his assessment, Dr. Bajwa listed the entire duration of his treatment of Plaintiff—December 21, 2007 to August 5, 2013—in response to the question, "What is the earliest date that this assessment applies?" (AR 24, 736.) Dr. Bajwa stated that Plaintiff could sit and stand for one hour at a time, but less than two hours total in an eight-hour workday; could occasionally twist but never stoop, bend, crouch, squat, climb stairs, or climb ladders; would be off-task twenty-five percent or more of the time; and was incapable of even "low stress" work. (AR 24, 735-36.) Dr. Bajwa identified tenderness and limited range of motion of the cervical and lumbar spine as his supporting clinical findings and objective signs. (AR 24, 733.)

///

The ALJ gave "significant weight" to Dr. Bajwa's opinions and adopted his limitations to the extent that the record reasonably supported them. (AR 24.) Although he indicated that the limitations were present during his entire course of treating Plaintiff, the ALJ stated that the record as a whole does not support the degree of limitations until after the date last insured. (*Id.*) The ALJ gave less weight to the opinions of the State agency physical review consultants, although they were credible, in deference to Plaintiff and Dr. Bajwa. (*Id.*) The ALJ also gave little weight to the opinions of the State agency mental review consultants. (AR 24.) Finally, the ALJ found that the third-party function report and opinions of Plaintiff's son were not credible or unbiased. (AR 25-26.)

The ALJ found that the treatment record as a whole revealed mild findings relating to Plaintiff's alleged back problems, pancreatitis, and depression. (AR 22-26.) In light of the objective evidence discussed, the Court finds that the ALJ's determination is supported by substantial evidence.

The Court finds that this is a clear and convincing reason, supported by substantial evidence, for discounting Plaintiff's credibility.

### 4. Conclusion

Having determined that one of the ALJ's reasons for discounting Plaintiff's credibility—routine and conservative treatment—is not clear and convincing, the Court must decide whether the ALJ's reliance on that reason was harmless error. *Carmickle*, 533 F.3d at 1162. The relevant inquiry "is not whether the ALJ would have made a different decision absent any error," but whether the ALJ's decision is still "legally valid, despite such error." *Id.* The "remaining reasoning *and ultimate credibility determination* [must be] . . . supported by substantial evidence in the record." *Id.* (emphasis in original) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). Here, given the discussion above concerning Plaintiff's inconsistent statements and the lack of supporting objective evidence, the

///

14

Court concludes the ALJ's credibility finding is legally valid and supported by substantial evidence.

### B. The ALJ Properly Characterized Plaintiff's Ability to Manipulate in the RFC

Plaintiff contends that the ALJ abused her discretion in the assessment of Plaintiff's RFC by permitting "frequent" handling while precluding "repetitive" handling. (JS at 22-24.) Plaintiff argues that "[t]he concept of repetitively doing a task encompasses constant activity and at least half of frequent activity. A limitation against a repetitive action is broader than a limitation against constant action." (JS at 23.) Plaintiff acknowledges that the vocational expert's suggested jobs involve "frequent" handling and fingering, but contends that she "cannot perform these jobs on a full-time basis because she cannot repeatedly handle and finger." (*Id.*)

As a preliminary matter, there is nothing facially contradictory about the RFC's limitations on handling or fingering. Although "repetitive" is not defined by the Dictionary of Occupational Titles ("DOT"), each time the ALJ used the term "repetitive" in these proceedings, she defined it as "constant." (*See* AR 20 ("repetitive or constant"), 103 ("what I mean by repetitive movement is constant movement"), 107 ("no repetitive or constant").) The DOT defines "constantly," in the context of handling and fingering, as occurring "2/3 or more of the time." *E.g.*, DOT 211.467-030 (ticket seller); DOT 159.341-010 (juggler); DOT 144.061-010 (painter). "Frequently" refers to handling or fingering that occurs "from 1/3 to 2/3 of the time." *E.g.*, DOT 209.587-010 (addresser); DOT 209.567-014 (order clerk, food and beverage); DOT 713.687-026 (lens inserter). Accordingly, permitting "frequent" handling does not conflict with prohibiting "repetitive or constant" handling.

The ALJ is responsible for assessing a claimant's RFC. 20 CFR 404.1546(c). In doing so, the ALJ may reject the opinion of a treating or examining

doctor if she articulates specific and legitimate reasons for the rejection. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Here, "[a]fter careful consideration of the entire record," the ALJ determined that Plaintiff "cannot perform repetitive or constant handling or fingering, but frequent is still permissible." (AR 20.) In formulating the RFC, the ALJ gave "significant weight" to Dr. Bajwa's opinions and adopted his limitations "to the extent they could be reasonably supported by the record," as discussed above. (AR 24.) Plaintiff notes that Dr. Bajwa reported that Plaintiff could "occasionally lift less than 10 pounds," but "[o]ccassional lifting does not equate to frequent or repetitive lifting." (JS at 22.) The ALJ did not reject this limitation: the RFC limits Plaintiff to lifting "10 pounds occasionally." (AR 20.) The ALJ also noted that Dr. Bajwa's most recent report did not include limitations on manipulating. (AR 24.) The ALJ nevertheless deferred to Plaintiff's testimony and precluded repetitive handling and fingering. (AR 24.)

At step five, it is the Commissioner's burden to establish that, considering the RFC, a claimant can perform other work. 20 CFR 404.1520(g)(1). To make this showing, the ALJ may rely on the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). Here, the ALJ posed a hypothetical to the vocational expert that presented the same limitations as contained in Plaintiff's RFC. (AR 107.) The vocational expert provided examples of sedentary, unskilled entry-level work that would be available to someone with those limitations. (AR 107.) The jobs identified—addresser, food and beverage order clerk, and lens inserter—all require "frequent," but not "repetitive or constant," handling and fingering. (*Id.*) The ALJ did not err in relying upon this testimony to find that Plaintiff was capable of performing other work and therefore not disabled.

The Court finds that the ALJ provided sufficient reasons for rejecting Dr. Bajwa's opinions and that RFC's limitations on manipulating are supported by substantial evidence.

## V. CONCLUSION

IT IS ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 27, 2017

*Rozella A. Oliver*

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN WESTLAW, LEXIS/NEXIS, OR ANY OTHER LEGAL DATABASE.**